UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

MIKYUNG P. KWON                          :
                                         :
        Plaintiff,                       :
                                         :
        v.                               :    No. 2:11-cv-193
                                         :
UNIVERSITY OF VERMONT AND                :
STATE AGRICULTURAL COLLEGE               :
                                         :
        Defendant.                       :

**OPINION AND ORDER**

Plaintiff, Dr. Mikyung P. Kwon, brings this suit against
her former employer, the University of Vermont and the State
Agricultural College ("UVM" or "the University").  Kwon alleges
that UVM discriminated against her on the basis of age, race,
national origin, and place of birth[1] in violation of 42 U.S.C.
§ 2000e *et seq.*, 29 U.S.C. § 621 *et seq.*, and the Vermont Fair
Employment Practices Act, 21 Vt. Stat. tit. 495.  Kwon further
alleges that UVM created a hostile work environment and
intentionally caused her emotional distress.  UVM now moves for
summary judgment on all claims.  For the following reasons, the
University's motion is denied in part and granted in part.

---

        1.    Kwon alleged national origin and place of birth discrimination
within her single count of race discrimination.  (Kwon's Complaint, ECF No.
1, at 6).  The parties have treated these three claims as indistinguishable,
and, for the purposes of this motion, the Court does so as well.

# I.    FACTUAL BACKGROUND

The following facts are presented in the light most favorable to Kwon as the non-moving party.  In 1999, Kwon began working in the University's Continuing Education Department. That same year, the Department hired two other women: Cynthia Belliveau and Carroll Vallett.  Belliveau began as Associate Dean of Professional Programs and Vallett began as the Academic Programs Manager.  In 2002, Vallett and Belliveau became Interim Co-Directors of the Continuing Education Department.  They held that position jointly until 2007, when they became Co-Deans of the Continuing Education Department.

Around 2005, Kwon began to feel that she was being treated differently than other staff within the Continuing Education Department.  (Kwon Deposition, ECF No. 37-11, at 31).  For instance, she relates that most staff members attended at least one national or regional conference annually; many staff attended without making presentations.  In 2005, the Department refused to allow Kwon to attend a national conference without making a presentation.  (ECF No. 37-11, at 31; Kwon's Discovery Answers, ECF No. 37-2, at 10).

According to Kwon, the disparate treatment continued and escalated following a landlord-tenant dispute between Kwon and six tenant-students in 2006.  The dispute arose when Kwon and her husband attempted to evict the students from apartments they

2

owned.  A hearing was held in March 2006.  At the hearing, one of the tenant-students referred to Kwon as a "notorious slumlord," and during the hearing three of the students' fathers—all out-of-state attorneys—accused Kwon of using confidential information against their children.  (Belliveau Deposition, ECF No. 34-6, at 86).  Belliveau's son, who was in a relationship with one of the students Kwon sued, attended the hearing with some of his friends.  He and his friends informed Belliveau of both the term and the attorneys' accusations.  (Vallett Deposition, ECF 34-5, at 113–114; ECF No. 34-6, at 86).  Belliveau repeated the term "notorious slumlord" to Vallett.  (Vallett Deposition, ECF No. 37-6, at 113; Belliveau Deposition, ECF No. 37-9, at 101–102).

Belliveau convened a meeting to determine whether Kwon had used confidential information against students.  Without giving her prior notice, Belliveau went to Kwon's office on March 13, 2006, interrupted a meeting between Kwon and a student, and requested Kwon to report to the office as soon as the meeting was over.  (ECF No. 37-2, ¶ 14).  Waiting in Belliveau's office were members of the Management Team and Belliveau's son.  (Id.).  Belliveau raised the concern that Kwon had used confidential student information.  She also asked Kwon about the number of rental properties and the rate charged.  Kwon responded that she had done nothing wrong and that she had only referred to the UVM

Directory.  (Id.).  It was later determined that information in the UVM Directory did not constitute confidential information.

Following the March 13, 2006 meeting, one of Kwon's supervisors, Beth Taylor-Nolan, held performance assessments. Belliveau attended Kwon's performance assessment, as she did others.  During the meeting, Belliveau again raised the lawsuit and the allegations that Kwon had used confidential information. Kwon again denied using confidential information in relation to the lawsuit.  The parties dispute whether Kwon was placed on probation following the performance assessment.  (Taylor-Nolan Deposition, ECF No. 34-7, at 68-69, 112-13, 163-65; ECF No.37-2, at 10, ¶ 22).

Following the 2006 meetings, Kwon felt that Belliveau began to isolate her at work.  Kwon stated that Belliveau routinely failed to invite Kwon to both ad-hoc and scheduled meetings. (ECF No. 37-2, at 5, ¶ 4).  When Kwon attended meetings, Belliveau ignored her presence and disregarded her responses to questions Belliveau raised.  (Id. at 6, ¶ 8).  Kwon also reported that Belliveau ignored her when they passed in the halls, the parking lot, and at a 2007 Christmas party at Belliveau's home.  (Id. at 4-5, ¶¶ 1, 2, 4).

Belliveau's form of treatment of Kwon spread to other managers within the Department.  For instance, Kwon compiled and sent data reports on the GAP Program to Belliveau, Vallett and

4

Nolan.  (Id. at 9, ¶¶ 16, 17).  When Kwon asked Belliveau
whether she had been receiving the reports, Belliveau stated
that she had but that the reports contained too much data.
(Id.).  Kwon continued sending the reports until she was
terminated.  Towards the end of her time at UVM, neither
Vallett, Belliveau, nor Nolan responded to the data Kwon
prepared.  (Id.).

According to Kwon, every time there was a reorganization,
her role became smaller.  (ECF No. 37-11, at 174).  The
Continuing Education Department was organized into teams, and
all of the advisors in the Department were on two or more teams,
except for Kwon.  (ECF No. 37-2, at 9, ¶ 19).  In her role on
the Global Team, Kwon was instrumental in bringing a group of
Pakistani students to the University.  (Id.).  Nolan assigned
Kwon to a position on the Global Team that included a trip to
Washington, DC.  (Id. at 6, ¶ 7).  Despite Kwon's expressed
desire to remain on the Team and before she could go on the
trip, Belliveau removed Kwon from the Global Team.  (Id. at 6-7,
¶¶ 7, 9).  Kwon was moved to the Online Team, but was not
invited to meetings. (Id. at 9, ¶ 20).  When she attempted to
join the Environmental Team, she was rebuffed by the managers in
the Department.  (Id. at 9, ¶ 19).

Around August 2008, UVM experienced financial difficulties.
In response to a budget shortfall, the University requested the

Continuing Education Department to reduce its annual budget by $500,000.00. (ECF No. 34-6, at 45-46). Because Belliveau was on administrative leave during the 2008-2009 academic year, Vallett took the lead in developing a plan to cut the Department's budget. (ECF No. 34-5, at 84). However, Belliveau was involved in drafting the plan. While Belliveau did not create a list of names or positions to be eliminated, she and Vallett discussed the planned cuts in a few face-to-face meetings and several telephone calls. (ECF No. 34-6, at 70-71, 74). They discussed Kwon's position at some point during their conversations, and Belliveau described the personnel cuts as a joint decision. (Id.).

The result of Vallett's and Belliveau's conversation was the January 2009 Reorganization Plan. Among other cuts, the Plan proposed shrinking Continuing Education's budget by reducing marketing expenses; cutting teams, including the Online/Distance Learning Team; and eliminating or reducing five staff positions. (ECF No. 34-5, at 64). In the end, Kwon and another individual were fired. (ECF No. 34-5 at 70-71). In February 2009, Vallett informed Kwon that her position would be terminated in June 2009.

Vallett stated that Kwon's position was eliminated because her role within the Department would shrink after the Reorganization plan. According to Vallett, Kwon's work was

split evenly between advising GAP students and the Online/Distance Learning Team.  Vallett claimed that Kwon was eliminated because the Online/Distance Learning Team was to be disbanded and the need for GAP services was expected to decline. (ECF No. 34-5, at 71, 86-87).

Following Kwon's departure, her work was redistributed to younger staff in the Continuing Education Department.  (Nunziata Deposition, ECF No. 37-7, at 31; Worthley Deposition, ECF No. 37-8, at 38).  The technical support Kwon provided students taking online courses was outsourced to a third-party vendor. (ECF No. 34-7, at 31, 34).  According to UVM, no new staff was hired to make up for the loss of content development, advisory services, or technical support that Kwon provided.  (Id.).

Kwon disputes the University's justification.  She points out that the majority of her work was with GAP students, rather than an even split between GAP advising and work with the Online/Development Team.  (ECF No. 37-11, at 17).  Further, Kwon alleges that the need for GAP services in 2009 was high and that the demand for advising GAP students remained high.  (ECF No. 37-7, at 38).  She notes that the individuals that took primary responsibility for her GAP work were extremely overworked.  (ECF No. 37-8, at 19-20).  Kwon alleges that Belliveau preferred younger employees, and the individuals that took over Kwon's

work were in their forties or younger. (ECF No. 37, at 9-11; ECF No. 37-7, at 21, 80).

According to Kwon, the University is currently seeking to hire a project manager for the services that she used to provide. (ECF No. 37-7, at 31–33). Pointing to the third-party vendor that UVM hired in January 2009 and the University's current search for a project manager, Kwon disputes the University's claim that it has not hired additional personnel to do the work she once provided. (Id.).

After she was terminated in June 2009, Kwon filed an age discrimination complaint with UVM's Office of Affirmative Action/Equal Opportunity Office. The Office interviewed Belliveau as part of its investigation. During her interview, Bellvieau stated that Kwon and her husband were "notorious slumlords." (AAEO Report, ECF No. 37-3, at 11). Kwon has proffered expert testimony that this expression is racially derogatory toward Asian Americans. (Eastman Report, ECF 37-4, at 7). The Report found that, as early as 2005, Belliveau knew that Kwon was in a dispute with some of her tenants and that Kwon's use of the UVM Directory was not in violation of University policy. (Id. at 26). The Report concluded that Kwon had experienced a hostile work environment, but did not find that University policies were violated. (Id. at 27).

In February 2010, Kwon filed a charge of discrimination with the United States Equal Employment Opportunity Commission and Civil Rights Unit of the Vermont Attorney General's Office, alleging discrimination of race, national origin, age, and retaliation.  The Report concluded that Kwon did not suffer employment discrimination. (US EEOC Report, ECF No. 34-16, at 1).

## II.  LEGAL STANDARDS
### A.  Summary Judgment Standard

Pursuant to the Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A fact is material if it could affect the outcome of the lawsuit; a dispute is genuine if a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id. at 249.

Summary judgment is generally inappropriate where questions of the defendant's state of mind are at issue, and, therefore, the Second Circuit has repeatedly cautioned against granting summary judgment in employment discrimination claims where the

intent of the employer remains at issue.  See, e.g., Gorzynski
v. JetBlue Airways Corp., 596 F.3d 93, 101 (2d Cir. 2010); Gallo
v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219,
1224 (2d Cir. 1994).  However, "summary judgment remains
available to reject discrimination claims in cases lacking
genuine issues of material fact."  Chambers v. TRM Copy Ctrs.
Corp., 43 F.3d 29, 40 (2d Cir. 1994).

### B.    Discrimination Laws

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§
2000e et seq., makes it "an unlawful employment practice for an
employer . . . to fail or refuse to hire or to discharge any
individual or otherwise discriminate against any individual with
respect to his compensation, terms, conditions, or privileges of
employment, because of such individual's race, color, religion,
sex, or national origin."  42 U.S.C. § 2000e-2(a) (2006).

The Age Discrimination in Employment Act (ADEA) makes it
"unlawful for an employer . . . to fail or refuse to hire or to
discharge any individual or otherwise discriminate against any
individual with respect to his compensation, terms, conditions,
or privileges of employment, because of such individual's age.
29 U.S.C. § 623(a) (2006).

The Vermont Fair Employment Practices Act (VFEPA) makes it
unlawful "[f]or any employer, employment agency, or labor

organization to discriminate against any individual because of race, color, religion, ancestry, national origin, sex, sexual orientation, gender identity, place of birth, age, or disability." Vt. stat. ann. tit. 21, § 495(a)(1).

### C. **McDonnell Douglass** Framework

When reviewing discrimination claims, the Court follows the McDonnell Douglass burden-shifting scheme. See McDonnell Douglass Corp. v. Green, 411 U.S. 792 (1973); accord Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000). The framework is applicable to all the federal and state discrimination claims at issue in this case. See Green v. Vermont Country Store, 191 F. Supp. 2d 476, 482 (D. Vt. 2002) (citing Carpenter v. Cent. Vt. Med. Ctr., 743 A.2d 592, 594 (1999)); see also Vivenzio v. City of Syracuse, 611 F.3d 98, 107 (2d Cir. 2010).

The McDonnell Douglass scheme shifts the burden of production between the parties and orders the presentation of proof in order to "'progressively . . . sharpen the inquiry into the elusive factual question of intentional discrimination.'" Bucalo v. Shelter Island Union School Dist., 691 F.3d 119, 128 (2d Cir. 2012) (quoting St. Mary's Honor Ctr. v. Hicks, 502 U.S. 506 (1993)). The plaintiff bears the first burden of

production, which requires the plaintiff to demonstrate a *prima facie* case of discrimination.  <u>Bucalo</u>, 691 F.3d at 128.

To establish a *prima facie* case, the plaintiff must demonstrate: (1) that she was within a protected group, (2) that she was qualified for the position, (3) that she suffered an adverse employment action, and (4) that circumstances surrounding the adverse employment action could give rise to an inference of age discrimination.  <u>Bucalo</u>, 691 F.3d at 129.  The *prima facie* case is a low bar, and the mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the *prima facie* stage of the analysis.  <u>Zimmermann v. Assoc. First Capital Corp.</u>, 251 F.3d 376, 381 (2d Cir. 2001).

If the plaintiff establishes the *prima facie* case, the burden shifts to the employer to offer a legitimate, nondiscriminatory explanation for the adverse employment action. <u>Bucalo</u>, 691 F.3d at 129.  The reason must be both "clear and specific."  <u>Meiri v. Dacon</u>, 759 F.2d 989, 997 (2d Cir. 1985).

If the employer satisfies its burden of production, the burden shifts back to the plaintiff and "merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination."  <u>Bucalo</u>, 691 F.3d at 129 (internal quotation and citation omitted).  In other words, the plaintiff must establish both that the employer's reason was

pretextual and that discrimination was the real reason for the adverse employment action. Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001); accord Hicks, 509 U.S. at 512-520 (1993).

In attempting to satisfy this final burden, plaintiffs may rely on evidence tending to undermine the employer's explanation, because "proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." Reeves, 530 U.S. at 147. In determining whether an employer's stated justification is worthy of credence, this Court should not second-guess the employer's decisions. However, the "employer's invocation of the business judgment rule does not insulate its decision from all scrutiny in discrimination cases" because there is a distinction between poor business decisions and reasons manufactured to avoid liability. Weiss v. JP Morgan Chase & Co., 332 Fed. App'x. 659, 663 (2d Cir. 2009) (citing Dister v. Continental Group, Inc., 859 F.2d 1109, 1116 (2d Cir. 1988)).

To defeat summary judgment, "the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." Holtz v. Rockefelller &

Co., Inc., 258 F.3d 62, 78 (2d Cir. 2001) (internal quotation and citation omitted). "Only occasionally will a *prima facie* case plus pretext fall short of the burden a plaintiff carries to reach a jury trial on the ultimate question of discrimination." Zimmermann, 251 F.3d at 382; Reeves, 530 U.S. at 148 ("[A] plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").

Determining whether discrimination was the real reason for the adverse employment action requires a "case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy h[er] 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" Schnabel v. Abramson, 232 F.3d 83, 87 (2000) (quoting Reeves, 530 U.S. at 143). In reaching this conclusion, courts must consider "the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for summary judgment." Reeves, 530 U.S. at 148–49.

### III. DISCUSSION
### A.   Count 1: Title VII Claim
#### 1.   The *Prima Facie* Case

The parties do not dispute that Kwon can demonstrate three of the four elements of a *prima facie* case of race discrimination.  UVM contends it is entitled to summary judgment because Kwon cannot establish that she was terminated under circumstances that would give rise to an inference of race discrimination.

Kwon established a *prima facie* case of race discrimination. She was the only person of color when her position was terminated, and, therefore, when UVM redistributed her work to existing employees, it redistributed her work to individuals outside of a protected class.  (EDF 37-1, at 4, ¶ 1; ECF No. 37-2 at 4, ¶ 3; ECF 37-7, at 16).  As replacement by someone outside the protected class is sufficient to create an inference of race discrimination, Kwon satisfied this minimally burdensome requirement.  See, e.g., Zimmermann 251 F.3d at 381; see also De La Cruz v. New York City Human Res. Admin. Dep't of Soc. Servs., 82 F.3d 16, 20 (2d Cir. 1996).

#### 2.   Legitimate, Nondiscriminatory Reason

UVM contends that even though Kwon established a *prima facie* case of race discrimination, it is entitled to summary judgment because it has articulated a legitimate, non-discriminatory reason for the termination, and Kwon failed to

15

satisfy her final burden.  Before this Court considers whether Kwon met her final burden, it must determine whether UVM articulated a legitimate, non-discriminatory reason for the termination because if UVM has failed to meet its burden of production and a rational jury would have to conclude that Kwon established the *prima facie* case, the Court must award judgment to Kwon.  <u>Hicks</u>, 509 U.S. at 509; see <u>First Fin. Ins. Co. v. Allstate Interior Demolition Corp.</u>, 193 F.3d 109, 115 (2d Cir. 1999) (noting that courts have the authority to grant summary judgment against the movant).

The University satisfied its burden of production.  UVM contends that it fired Kwon in response to a financial crisis as part of a reorganization plan.  Specifically, the University alleges that Vallett terminated Kwon's position under the reorganization plan because she cut the Online/Distance Learning Team and expected the need for GAP services to decline.  (ECF No. 34, at 14).  Because this evidence would permit a reasonable jury to conclude that Vallett fired Kwon for legitimate, non-discriminatory reasons, UVM met its burden.

### 3.  Evidence of Pretext

As UVM articulated a legitimate, non-discriminatory reason, the burden of production shifts back to Kwon and merges with her ultimate burden to persuade the court that the University

discriminated against her on the basis of race by a
preponderance of evidence.  Henry v. Wyeth Pharm., Inc., 616
F.3d 134, 157 (2d Cir. 2010).  Again, to satisfy her burden,
Kwon does not have to demonstrate that UVM's rationales played
no role in her termination, but only that they were not the only
justifications and her race was at least a motivating factors.
Holtz, 258 F.3d at 78.

     Kwon submitted sufficient evidence for a reasonable jury to
conclude that the University's justification was pretextual.
She produced evidence that the need for GAP services was not in
decline, that the University hired people to provide technical
support that Kwon provided, that the University is in the
process of hiring a project manager that for online work she
once provided, and that Belliveau disliked her and was involved
in the decision-making process.  (ECF No.37-1, ¶¶ 50, 56, 69;
ECF No. 37, at 10; ECF No. 37-2, at 4-9; ECF No. 34-6, at 70-71,
74).  Given these facts, a reasonable jury could conclude that
the University's explanations were pretextual.  The Court must
now determine whether a reasonable jury could conclude that Kwon
was fired because of her race.

     A reasonable juror could conclude that Kwon was
discriminated against on the basis of race.  Only rarely will a
*prima facie* case of discrimination plus evidence of pretext be
insufficient to carry the ultimate question of discrimination to

a jury. Zimmermann, 251 F.3d at 382. Here, Kwon has satisfied that burden, though barely. She established the *prima facie* case and submitted evidence that UVM's explanation is not worthy of credence. In addition, her expert will testify that "the phrase 'notorious slumlord' is a semantic move or coded language describing a person from a racial group who are commonly stereotyped as sneaky, stingy, greedy, etc." (ECF 37-4, at 7). He will state that the remark "reflects a racial stereotype that successful Asians gain their success by exploiting innocent others out of greed." (Id.). Given the facts before it, this Court is unwilling to assume that Belliveau's comments are not possibly probative of a discriminatory motive. Because this Court believes that a reasonable jury could conclude that Kwon was discriminated against on the basis of race, summary judgment on the race discrimination claim is **denied**.

## B. Count 2: ADEA Claim
### 1. The *Prima Facie* Case

As with Kwon's race discrimination claim, only the fourth element of her *prima facie* case of age discrimination is disputed.

The evidentiary burden to establish the *prima facie* case is minimal and replacement by an individual outside the protected class is sufficient. Abdu-Brisson, 239 F.3d at 467 (2d Cir. 2001); Zimmermann, 251 F.3d at 381. Kwon met her burden because

she was seventy when she was terminated and her workload was assumed by people in their forties or younger. (Plaintiff's Undisputed Facts, ECF No. 37-1, ¶ 53; see also ECF No. 37-7, at 31).

### 2.    Legitimate, Non-Discriminatory Reason

As discussed above in reference to the race discrimination claim, UVM articulated a non-discriminatory justification for the employment decision.

### 3.    Evidence of Pretext

There is sufficient evidence for reasonable jury to conclude that the University's explanations were pretextual. The question is whether a reasonable jury could conclude that Kwon was discriminated against on the basis of age.

Kwon established a *prima facie* case of age discrimination and provided sufficient evidence for a jury to conclude that the University's stated justifications were false. Multiple witnesses will testify that Belliveau was aware of age and treated younger employees differently than older employees. (ECF No. 37-1, ¶¶ 42-46). For example, at her deposition, Debbie Worthley stated that Belliveau had a preference for younger employees and hired younger people for jobs that required more experience than they had. (ECF No. 37, at 9-11). Janet Nunziata also stated that Belliveau was aware of age, and

she recalled at least one occasion where Belliveau asked a job candidate about his age.  (ECF No. 37-7, at 21, 80).  Accordingly, a reasonable jury could conclude that Kwon's age contributed to the University's decision to terminate her position.  Summary judgment on Kwon's age discrimination claim is **denied**.

### C.  Hostile and Abusive Work Environment

To survive summary judgment on a hostile work environment claim, the plaintiff must be able to demonstrate that the workplace was "so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered."  Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002) (internal quotation and citation omitted).  To succeed, a plaintiff must be able to demonstrate that the workplace was objectively and subjectively altered.  Id.

In order to demonstrate that the workplace was both objectively and subjectively altered, the plaintiff must point to "sufficiently continuous and concerted" acts.  Id.  While isolated acts are usually insufficient to establish that a workplace was hostile, a single act could be sufficient if it "can and does work a transformation of the plaintiff's workplace."  Id.  In determining whether the workplace was

hostile, courts must review the totality of the circumstances and may consider facially neutral incidents so long as a reasonable jury could conclude that they were based on the plaintiff's protected class. Alfano, 294 F.3d at 378. The analysis is the same under Title VII, the ADEA, and VFEPA. Brennan v. Metro Opera Ass'n Inc., 192 F.3d 310, 318 (2d Cir. 1999); Fernot v. Crafts Inn, Inc., 895 F.Supp. 668, 678 (D. Vt. 1995) (quoting Hodgdon v. Mt. Mansfield Co., Inc., 624 A.2d 1122, 1129 (Vt. 1992)).

Kwon satisfied the subjective and objective component of her hostile work environment claim. Kwon alleged that the isolation she felt within the Continuing Education department was draining. (ECF No. 37-1, ¶ 74). She has also provided sufficient facts to allow a reasonable inference that Belliveau's treatment was so severe and sustained that it objectively altered the conditions of the workplace. The alleged harassment began in 2005, when Belliveau denied Kwon the opportunity to attend a conference but allowed similarly situated employees to go. (ECF No. 37-2, at 9–10). Belliveau's mistreatment continued and escalated after Belliveau learned that Kwon sued her son's girlfriend in a landlord-tenant dispute. (Id. at 4–9). Taken as a whole, the incidents that Kwon describes were sufficient to alter the conditions of the workplace. As discussed above in reference to the age and race

discrimination claims, a reasonable juror could infer that Kwon was mistreated because of her age and/or race.  Because a reasonable jury could infer that Kwon's work environment was hostile because of her age and/or race, summary judgment must be **denied.**

### D. VFEPA Claim

VFEPA claims are analyzed under the same rubric as Title VII and ADEA claims.  <u>Vermont Country Store</u>, 191 F. Supp. 2d at 482.  Accordingly, summary judgment on Kwon's VFEPA claim must be **denied**.

### E.    Intentional Infliction of Emotional Distress (IIED) Claim

To state a case for IIED in Vermont, plaintiffs must be able to demonstrate: (1) outrageous conduct, (2) done intentionally or with "reckless disregard of the probability of causing emotional distress", and (3) actually or proximately causing extreme emotional distress.  <u>Fromson v. State</u>, 848 A.2d 344, 347 (Vt. 2004) (internal quotation and citation omitted). To satisfy the first element, plaintiffs must allege conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." <u>Id.</u> (internal quotation and citation omitted).  The conduct must

be so extreme that "no reasonable person could be expected to endure it." Id. (internal quotation and citation omitted).

Kwon has not pointed to any conduct that is so extreme that it goes beyond all possible bounds of decency. Further Kwon has submitted no evidence tending to suggest that she suffered extreme emotional distress as a result of Belliveau's conduct. Accordingly, Kwon cannot satisfy two of the necessary three elements to prevail on a claim of IIED in Vermont. As such, summary judgment on Kwon's IIED claim is **granted**.

### IV. CONCLUSION

For the foregoing reasons, this Court **grants** the University's motion for summary judgment on Kwon's IIED claim and **denies** its Motion for Summary Judgment on Kwon's Title VII, ADEA, VFEPA, and hostile and abusive work environment claims.

Dated at Burlington, in the District of Vermont, this 6th day of December 2012.

/s/ William K. Sessions III__
William K. Sessions III
U.S. District Court Judge